## Laughlin Estate

*Blaxter, O'Neill & Houston*, for accountants.
*William J. Kenney*, for Sewickley Fresh Air Home.

RAHAUSER, J., December 7, 1954. — Mary M. Laughlin died on October 31, 1953, leaving her last will and testament dated December 29, 1944. In her will, which was duly probated November 5, 1953, she appointed A. K. McMillen, G. M. Wilson and the Fidelity Trust Company executors. The executors filed their account August 10, 1954, and the same came on for audit October 19, 1954. At that time a hearing was held before the auditing judge relative to the bequest in the will to the Sewickley Fresh Air Home. The eighth and eleventh paragraphs provide:

*"Eighth:* I give and bequeath to *Sewickley Fresh Air Home,* Sewickley, Pennsylvania, a sum equal to fifteen (15%) per cent. of the personalty comprising my gross estate.

*"Eleventh:* All bequests to *Sewickley Fresh Air Home* and *Laughlin Memorial* under the provisions of this Will shall become and be held as a part of the endowment funds of the said institutions, the income therefrom to be used for general corporate purposes; provided, however, that the principal of the bequests may be used to defray the cost of new buildings, or additions thereto, or other capital improvements, or for the purchase of land, to the extent the respective Boards of Trustees of said two institutions, or those in whom is vested the authority and control over the expenditure of the principal of their funds, may, in their discretion, deem advisable."

The testimony developed that the Sewickley Fresh Air Home was an institution for the care of underprivileged children, devoted to child guidance and child health activities. It was incorporated by decree of the Common Pleas Court of Allegheny County, per Judge Frazer, on June 24, 1901, recorded in the office of the recorder of deeds, charter book, vol. 28, page 275. Alexander Laughlin, husband of decedent, was

one of the three incorporators. He was, along with Frank Semple and Robert Wardrop, one of the original three trustees and served in such capacity until his death on August 30, 1943. Mrs. Laughlin was named in the articles as one of the original 24 members of the board of managers of the corporation and served as a member of the board and president from the corporation's origin until her death. The corporation was an outgrowth of a prior unincorporated association formed by Mrs. Laughlin in 1897 which operated a fresh air home until its incorporation. Mr. Laughlin contributed to the initial funds to purchase land for the construction of a building and in 1901 defrayed the entire expense of the construction of a building for use by the corporation. Mr. Laughlin thereafter contributed an initial gift of $10,000 to establish an endowment fund for the home, to which many other interested individuals thereafter contributed.

Mrs. Laughlin, as president, acted as the active executive head of the institution for more than 50 years, until the disabilities of age prevented such activity. She purchased from her own funds many of the items needed in the operation of the home. After Mr. Laughlin's death she met the annual operating deficit of the home of approximately $2,000. The Sewickley Fresh Air Home was the primary charitable interest of Mrs. Laughlin and her husband and for more than 50 years she devoted a large portion of her time to its operations and contributed generously to its support. The trustees and board of managers, on October 17, 1952, resolved to suspend operation effective December 1, 1952. On July 27, 1953, the home and the land on which it was located were sold by the trustees for the sum of $25,000.

The assets of the home presently consist of endowment funds in the sum of $113,194.31 and cash in

the amount of $99,230.42, or a total of $212,424.73. The trustees and board of managers remained active and held frequent meetings throughout 1953 and 1954. The trustees and board were engaged from October of 1952 to the present time in developing plans for the renewal of the activities of the home. The earliest written proposal is that of Mrs. Nix dated November 1952. On July 1, 1953, at a joint meeting of the trustees and board, Mrs. Davis presented a complete plan which was approved in principle by the board. On February 6, 1954, a final plan was presented and was adopted by the trustees and Executive Board. The plan contemplated the construction of a modern building to house child guidance and child health activities. The necessary land has been located and is in the process of purchase. An architect has been engaged to present preliminary designs.

The first question to be considered is whether the activity of the board of directors of the Sewickley Fresh Air Home in suspending operations was tantamount to surrender of its charter.

The other question involved is whether effect may be given to a legacy to a charitable corporation which, at the date of death of testatrix, has suspended operation but is in the process of developing plans for its further activity.

The court finds as a fact that the closing of the home did not terminate the corporate existence or affect the legal capacity of the institution to receive the bequest of the testatrix.

The Supreme Court has held that a nonprofit corporation charter was not abandoned for nonuse although all activity of the corporation has ceased for 26 years. In the case of Commonwealth ex. rel. v. Neptune Club of Philadelphia, 321 Pa. 574, 576, Mr. Justice Drew said:

"The judgment must be affirmed. Appellant's argument, relying as it does upon the *presumed* intention of defendant's members to abandon their corporate franchise, based upon their extended period of inactivity, overlooks the trial judge's finding that they always maintained their corporate affiliation. However inactive they might have been, there is no affirmative evidence of any intention to abandon the charter. From all that appears, the organization was merely quiescent. Activity could be resumed at any time. 'A dormant corporation possesses a vitality which at any time may galvanize it into action'."

Here dissolution was not sought by the corporation. There is voluminous evidence in the case before the court that the trustees and directors consistently worked on plans for the resumption of corporate activity in the field of child guidance and child health. In Garrison's Estate, 17 D. & C. 272 (O. C., Philadelphia Co., 1932), in an opinion by Judge Gest, it appeared that Mrs. Garrison created an inter vivos trust providing for a remainder interest of $50,000 to the "Church Temperance Society", a nonprofit corporation organized under the laws of the State of New York.

The claim of the Church Temperance Society to the gift was contested on the ground that the society had departed from its corporate objects and that prior to the death of Mrs. Garrison the society had been entirely inactive in relation to the objects of its incorporation and the objects for which the gift was intended. It appeared from the testimony that the discontinuance of activity had been due to the scandal caused by its former superintendent and the lack of sufficient funds to pursue its corporate purposes. The corporation became inactive but it maintained its officers and corporate organization and did

not surrender its charter. No evidence was introduced as to plans for resumption of corporate activity. Judge Gest held that the Church Temperance Society was entitled to distribution of the $50,000 gift, notwithstanding the suspension of corporate activities, stating at page 275:

*"In my opinion, the inactivity of the corporation, due to the causes mentioned or perhaps others, does not operate to cause a forfeiture of its claim to the gift under Mrs. Garrison's deed. The corporation is in legal existence, and mere inactivity, however caused, is not by any means a vital objection to its legal capacity to take.* This would indeed be a strange objection, and no authority is cited for it. There are many charitable organizations which, for one reason or another, are doing little or nothing to promote the objects of their corporate organization and yet are entitled to receive money necessary for them to carry out their charitable purposes. Even when the charitable objects fail altogether, in this state, our courts have cy pres jurisdiction over the subject matter. And I may add, with reference to the prohibition legislation, that daily observation shows that the evils of intemperance still exist, and the suppression or alleviation of this evil are included among the corporate objects. So far as this branch of the case is concerned, I dismiss the objections to an award of the gift to the Church Temperance Society." (Italics supplied.)

From a reading of the entire will it is evident that Mrs. Laughlin's interest was not primarily focused upon an old frame building, which had long since outworn its usefulness, or upon any particular location. Her interest as expressed in her will was, as during her lifetime, in affording mental and physical care to children requiring assistance. She intended her bequest for this purpose and designated the particular

charity she desired to carry out her wishes. It would indeed be a violation of the known desires and specific intent of Mrs. Laughlin to divert the bequest from the trustees of the Sewickley Fresh Air Home. It would seem in logic to make little difference whether the trustees and board elected to commence the change to new quarters prior to Mrs. Laughlin's death or after receipt of the legacy.

A decree will be drawn in accordance with this opinion.